ELECTRONICALLY FILED
Pope County Circuit Court
Rachel Oertling, Circuit Clerk
2025-Jul-07  15:35:11
58CV-25-468
C05D03 : 20 Pages

## IN THE CIRCUIT COURT FOR POPE COUNTY, ARKANSAS

BITMAIN TECHNOLOGIES GEORGIA,                                    PLAINTIFF
LIMITED, a Georgia corporation

      VS.                    NO. 58CV-25-_____

BLACK ART OPERATION, LLC f/k/a
ARCT TECHNOLOGIES LLC, a                                          DEFENDANT
Delaware limited liability company

---

### VERIFIED COMPLAINT

---

Comes now the Plaintiff Bitmain Technologies Georgia Limited, by and through its attorneys, and hereby alleges and claims as follows in the above-captioned action against Black Art Operation, LLC f/k/a Arct Technologies LLC:

### PARTIES

1.     Plaintiff Bitmain Technologies Georgia Limited ("Bitmain" or "Plaintiff") is a corporation incorporated under the laws of the State of Georgia, having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076.

2.     Defendant Black Art Operation LLC f/k/a Arct Technologies LLC ("Black Art" or "Defendant") is a limited liability company formed under the laws of the State of Delaware, having its registered office at 262 Chapman Road, Suite 240, Newark, Delaware 19702.

Exhibit 1

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over Bitmain's claims against Black Art and is the proper venue therefor.

4.    Black Art maintains multiple facilities in Arkansas, including one located at 2198 Columbia Road 12, Magnolia, Arkansas 71753 and another located at 6568 Morgan Road, Dover, Arkansas 72837 (together, the "Facilities").  Black Art further maintains a warehouse at 1402 Highway 65 N, Damascus, AR 72039-9227 ("Damascus Warehouse").  Black Art's conduct at these Facilities gives rise and relates to Bitmain's claims in this action.  As detailed below, Bitmain seeks recovery for Black Art's conversion and mishandling of property held by Black Art at Black Art's facilities.  Therefore, this Court has personal jurisdiction over Black Art for the claims raised by Bitmain herein.  *See* Ark. Code Ann. § 16-4-101(C).

5.    Pope County is the county in which a substantial part of the events and omissions giving rise to the causes of action raised in this Complaint occurred.  *See* Ark. Code Ann. § 16-60-101(a)(1).

## BACKGROUND

6.    Black Art refuses to return over $15 million worth of property which Black Art does not own and which Black Art has no right to control.

7.    Bitmain brings this action against Black Art for Black Art's breach of a Service Framework Agreement (the "SFA," a true and correct copy of which is attached hereto as **Exhibit A**) between Black Art and Bitmain and for Black Art's other misconduct.[1]  Through this action,

---

[1] Although the SFA was entered into between Bitmain and Arct, Black Art and Arct are one and the same, as the only corporate change was to rename Arct to Black Art. Upon information and belief, no management or control changed, and there was neither any change to the SFA nor even any notice to Bitmain that such corporate xname change had occurred.

Bitmain seeks, *inter alia*, a temporary restraining order and injunction compelling Black Art to return property to Bitmain.

8.      On November 30, 2023, Bitmain engaged Black Art to operate data centers hosting 14,000 of Bitmain bitcoin mining servers (the "Hosted Servers")—specialized electronic devices used to generate revenue for Bitmain by validating bitcoin transactions. Bitmain relied on Black Art to provide facilities suitable to house the Hosted Servers, which require constant access to electrical power and the internet to operate. Bitmain expected to receive the rewards from any bitcoin that the Hosted Servers successfully mined, and in return, Bitmain paid Black Art a hosting fee.

9.      Bitmain operated the Hosted Servers at two Black Art Facilities in Arkansas: the first located at 2198 Columbia Road 12, Magnolia, Arkansas 71753 and the second located at 6568 Morgan Road, Dover, Arkansas 72837. Bitmain and Black Art later amended the SFA to add a third data center at 2801 1st St. SW, Underwood, North Dakota.

10.     However, on July 28, 2024, Black Art notified Bitmain that 1,070 units of the Hosted Servers would be transferred from the Dover facility to the Magnolia facility for operation, without specifying the exact date of transfer. Subsequently, Bitmain repeatedly urged Black Art to return the Hosted Servers to their original location, but Black Art refused. On February 20, 2025, during an inventory audit, Bitmain discovered that the Hosted Servers had been moved off-rack and relocated to the Damascus Warehouse. Upon information and belief, Black Art has removed the Hosted Servers from the Damascus Warehouse, and Bitmain no longer knows their location.

11.     On November 19, 2024, a blizzard caused extreme weather conditions for the area in which the Arkansas Facilities lie. On November 25, 2025, Bitmain discovered that 22 of the 29

total containers within which Bitmain's Hosted Servers are stored were buried under heavy snow as a result of the blizzard but that Black Art had failed to remove the snow covering those containers for at least six days. Black Art's failure to adequately care for Bitmain's technically complex and highly sensitive Hosted Servers risked significant damage thereto. Black Art not only failed to notify Bitmain of this emergency, but actively concealed it and the risks posed by it—preventing Bitmain from maintaining the safety of the Hosted Servers in violation of Article 6.5 of the SFA. (*See* Ex. A, at 18, art. 6.5 ("[Black Art] shall take standard industry practices and all necessary measures . . . to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents such as damage, loss or fire outbreak, etc. or any faults such as dust ingress, water ingress or snow ingress, etc.").)

12.    On or around November 28, 2024, Bitmain personnel witnessed fire and smoke emanating from one of the Facilities. In response, Bitmain requested access to the Facility to ensure that Bitmain's property was secure and undamaged. Black Art refused Bitmain's initial request for access to check on the property. Then, on the following day, Bitmain learned that nine Hosted Servers had been burned. Black Art not only failed to notify Bitmain of this emergency, but actively concealed it and the risks posed by it, preventing Bitmain from maintaining the safety of the Hosted Servers in violation of Article 6.5 of the SFA. (*See id.* ("[Black Art] shall take standard industry practices and all necessary measures . . . to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents such as damage, loss or fire outbreak, etc. or any faults such as dust ingress, water ingress or snow ingress, etc.").

13.    Since January 15, 2025, Black Art has failed to maintain stable and sufficient power to the Hosted Servers—and has even cut off the power supply to the Hosted Servers. Since February 1, 2025, Black Art has stopped powering the Hosted Servers entirely. This misconduct

violates Article 6.1 of the SFA. (*See id.* at 16, art. 6.1 ("[Black Art] shall provide BITMAIN with sufficient . . . power load and facilities . . . reasonably required for the normal operation of the Hosted Servers of the reasonable commercial standard, satisfying at least [certain enumerated] requirements . . . .").)

14.     Because of Black Art's continued and unremedied breaches, Bitmain was entitled to immediately terminate the SFA and access the Facilities to obtain the Hosted Servers. Bitmain notified Black Art of its withdrawal on May 22, 2025, and Bitmain attempted to obtain the Hosted Servers on or about May 23, 2025. But Black Art still has refused to comply with Bitmain's demands. Moreover, on May 23, 2025, Bitmain became aware that Black Art had removed the Hosted Servers from the Damascus Warehouse.

15.     Due to Black Art's severe breaches of the SFA, on June 23, 2025, Bitmain terminated the agreement and demanded that Black Art allow Bitmain to enter the Facilities to retrieve the Hosted Servers, as is Bitmain's right under the SFA. See **Exhibit A**, SFA, p. 24, Section 11.3(a)(iv). Black Art refuses and is unlawfully detaining Bitmain's property worth approximately $15 million at the Facilities or some unknown location. When Bitmain attempted to secure its Hosted Servers from their current location, Black Art physically prevented Bitmain from doing so.

16.     Black Art's conduct has also interfered with Bitmain's ability to fulfill its commitments to third parties. Bitmain has agreed to sell 4,794 of the Hosted Servers to GreenVolt Innovations LLC ("GreenVolt"). Because Black Art refuses to allow Bitmain to take possession of the Hosted Servers, as is Bitmain's right, Bitmain cannot comply with its contractual obligations to deliver the Hosted Servers to GreenVolt.

17.     Due to Black Art's refusal to allow Bitmain to retrieve its property, Bitmain now seeks an order enjoining Black Art from preventing Bitmain from retrieving the Hosted Servers, wherever they may be kept.

18.     Bitmain files this action seeking the return of its property.

<u>**GENERAL ALLEGATIONS**</u>

## I.  Bitcoin Mining

19.     Bitcoin is a crypto-asset that uses cryptographic principles to allow owners of bitcoin to securely transact with each other and to prove ownership of bitcoin via the bitcoin blockchain, a decentralized public ledger.

20.     No single organization controls bitcoin.   Rather, the bitcoin crypto-protocol maintains the bitcoin blockchain and provides for new bitcoins to enter the economy through a mechanism known as "mining."  Individuals "mine" bitcoin by using sophisticated computer programs to perform complex, resource-intensive computations which validate past bitcoin transactions.   Once the transactions are validated, they are added to the bitcoin blockchain, a distributed ledger accessible via the internet.

21.     The mining process is competitive.   The first miner to validate a block of transactions is rewarded with an amount of bitcoin, while other miners get nothing for that block. Blocks are mined on average once every ten minutes.   Until April 19, 2024, the reward for validating a block of transactions was 6.25 bitcoin.  On April 19, 2024, the rewards were halved, and the current reward for validating a block of transactions is 3.125 bitcoin.  Bitcoin miners can either sell the bitcoin for a fiat current, such as U.S. dollars, or hold the bitcoin as an investment. At the current price of bitcoin, the reward for mining a single block of bitcoin is worth approximately $320,000.

22.     Because the computations required to mine bitcoin are highly complex, miners typically use machines equipped with application-specific integrated circuit ("ASIC") chips to stay competitive.  These machines are custom-built to efficiently mine bitcoin and can cost thousands of dollars.  To increase their profitability, miners often operate hundreds or even thousands of ASIC miners at a time.

23.     Bitcoin mining, especially at a commercial scale, consumes significant amounts of electric power.  Without a reliable source of electric power, ASIC miners cannot be put to a productive use.

24.     ASIC miners are sophisticated electronic devices.  As such, they are vulnerable to damage from a variety of sources, such as water and moisture, heat, dust and debris, static electricity, and physical injury.  To mitigate the risk of damage, ASIC miners are typically stored in secured, climate-controlled data centers.

## II.  The SFA Between Bitmain and Black Art

25.     On November 30, 2023, Bitmain and Black Art entered into the SFA.

26.     The SFA is a valid and enforceable contract.

27.     The SFA incorporated a Service Order, attached to the SFA as Appendix I, which the Parties executed on November 30, 2023.

28.     The Service Order is a valid and enforceable contract.

29.     Pursuant to the SFA and the Service Order, Black Art was required to, among other things, provide and operate the Facilities, at which Bitmain would use 14,000 Hosted Severs to mine bitcoin.

30.     The Hosted Servers are sophisticated electronic devices that are vulnerable to damage from a variety of sources, including water and moisture, temperature fluctuations, dust

7

and debris, static electricity, and physical injury.  They are also valuable—worth thousands of dollars per device—and can be the target of theft.  Accordingly, the SFA required Black Art to "take standard industry practices and all necessary measures . . . to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents."  (*Id.* at 18, art. 6.5.)

31.    Under Paragraph 8.1 of the SFA, Black Art does not own and has never owned the Hosted Servers:

> Ownership of Hosted Servers.  Subject to Articles 8.2 and 8.3, Service Provider acknowledges and agrees that the Hosted Servers and Inventory Assets are assets of BITMAIN or any third party designated by BITMAIN (as applicable) (collectively, the "Owner of Hosted Servers") and the Owner of Hosted Servers shall solely have the proprietary interest in the Hosted Servers.  The Owner of the Hosted Servers' such interest shall not be affected by any factors, including but not limited to Service Provider's operating conditions, financial conditions or any disputes or lawsuits against its shareholders or any third parties.  In no event shall Service Provider's creditors, shareholders or other third parties be entitled to file disputes regarding the ownership of the Owner of Hosted Servers.  Without prejudice to the foregoing, in the event that any such dispute occurs, Service Provider shall provide the Owner of Hosted Servers with all reasonable assistance in proving the Owner of Hosted Servers' proprietary interest in the Hosted Servers.

(*Id.* at 21, art. 8.1.)

32.    Bitmain transported the Hosted Servers to Black Art's Facilities in multiple installments:  Bitmain transported its first installment of Hosted Servers on February 25, 2024, and transported its second installment of Hosted Servers on May 1, 2024.

33.    The 14,000 Hosted Servers have a value of over $15 million and are capable of generating approximately 1 bitcoin per day based on current network difficulty.  The current value of 1 bitcoin is approximately $100,000.

34.     It was important to Bitmain that Bitmain's personnel have unfettered access to the Facilities to, among other things, ensure the safety and security of Bitmain's valuable property. Accordingly, the SFA provided that Black Art should not restrict Bitmain's access to the Facilities:

> Service Provider [i.e., Black Art] shall provide all necessary support and cooperation for the operation and maintenance of the Hosted Servers by BITMAIN Personnel, including but not limited to that Service Provider shall grant BITMAIN Personnel access and permit to:
>
> (a)     enter into the Data Center Facility;
>
> (b)     obtain the operational data of the Hosted Servers;
>
> (c)     inspect the operational conditions of the Data Center Facility;
>
> (d)     perform maintenance on the Hosted Servers;
>
> (e)     handle or repair any Hosted Servers that may be damaged, defective, malfunctioning or not operating; and
>
> (f)     check, examine and conduct inventory audits of the Hosted Servers and Inventory Assets.

(*Id.* at 19, art. 6.7.)

35.     In exchange for providing a secure facility with constant access to electric power and the internet in which Bitmain could use the Hosted Servers to mine bitcoin, Bitmain paid Black Art a monthly hosting service fee.

36.     Beginning in March 1, 2024, Bitmain used the Hosted Servers to mine bitcoin at the Facilities.

### III.     Black Art's Negligence and Noncompliance Damage Bitmain's Property and Jeopardize the Use of the Hosted Servers.

37.     Starting in November 2024, Black Art began to repeatedly breach the SFA.

9

**A.      Black Art's Failure to Safeguard Bitmain's Property During and Following a Blizzard.**

38.    On November 19, 2024, a blizzard caused extreme weather conditions for the area of Arkansas in which the Facilities lie.

39.    On November 25, 2025, Bitmain discovered that 22 of the 29 total containers within which Bitmain's Hosted Servers are stored were buried under heavy snow as a result of the blizzard but that Black Art had failed to remove the snow covering those containers for at least six days.

40.    Black Art's failure to adequately care for Bitmain's technically complex and highly sensitive Hosted Servers risked significant damage thereto.

41.    Black Art not only failed to notify Bitmain of this emergency, but actively concealed it and the risks posed by it, preventing Bitmain from maintaining the safety of the Hosted Servers.

42.    Article 6.5 of the SFA provides the following in relevant part:

> [Black Art] shall take standard industry practices and all necessary measures . . . to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents such as damage, loss or fire outbreak, etc. or any faults such as dust ingress, water ingress or snow ingress, etc.

(Ex. A, at 18, art. 6.5.)

43.    Article 4.2 of the SFA further provides the following in relevant part:

> [Black Art] hereby makes the following representations and warranties to BITMAIN: . . . The Services shall be free from defects and shall meet the specifications as stipulated herein (including but not limited to provisions of Article 6).

(Ex. A, at 15, art. 4.2.)

44.    By failing to safeguard Bitmain's property during and following the blizzard, Black Art breached Article 6.5 and Article 4.2 of the SFA.

45.    Article 6.7 of the SFA further provides the following in relevant part:

> [Black Art] shall provide all necessary support and cooperation for the operation and maintenance of the Hosted Servers by BITMAIN Personnel .
> . . .

(Ex. A, at 19, art. 6.7.)

46.    By failing to notify Bitmain of this emergency and by actively concealing it, Black Art also has breached the covenant of good faith and fair dealing implied in every contract under the law of the State of Georgia, which laws govern the SFA by agreement of the parties.

47.    By failing to notify Bitmain of this emergency and by actively concealing it, Black Art also has engaged in fraudulent conduct as to a material issue upon which Bitmain rightly relied to its detriment.

48.    Bitmain has suffered both immediate and consequential damages as a result of Black Art's acts.

**B.    Black Art's Failure to Safeguard Bitmain's Property During and Following a Fire.**

49.    On or around November 28, 2024, Bitmain personnel witnessed smoke emanating from one of the Facilities.

50.    In response, Bitmain requested access to the Facility to ensure that Bitmain's property was secure and undamaged.

51.    Black Art refused Bitmain's initial request for access to check on the property.

52.    Then, on the following day, Bitmain learned that 9 Hosted Servers had been burned.

53.    Black Art not only failed to notify Bitmain of this emergency, but actively concealed it and the risks posed by it, preventing Bitmain from maintaining the safety of the Hosted Servers.

54.    As noted above, Article 6.5 of the SFA provides the following in relevant part:

> [Black Art] shall take standard industry practices and all necessary measures
> . . . to ensure safety and security of the Data Center Facility and the Hosted
> Servers against any safety accidents such as damage, loss or fire outbreak,
> etc. or any faults such as dust ingress, water ingress or snow ingress, etc.

(Ex. A, at 18, art. 6.5.)

55.    Article 4.2 of the SFA further provides the following in relevant part:

> [Black Art] hereby makes the following representations and warranties to
> BITMAIN: . . . The Services shall be free from defects and shall meet the
> specifications as stipulated herein (including but not limited to provisions
> of Article 6).

(Ex. A, at 15, art. 4.2

56.    By failing to safeguard Bitmain's property during the fire, Black Art breached Article 6.5 and Article 4.2 of the SFA.

57.    Based on the activities set forth above in this Section III, Black Art must "make prompt payment of the fair market value for such Hosted Servers." (*Id.* at 15, art. 4.2(b).)

58.    As noted above, Article 6.7 of the SFA further provides the following in relevant part:

> [Black Art] shall provide all necessary support and cooperation for the
> operation and maintenance of the Hosted Servers by BITMAIN Personnel .
> . . .

(Ex. A, at 19, art. 6.7.)

59.    By failing to notify Bitmain of this emergency and by actively concealing it, Black Art also has breached the covenant of good faith and fair dealing implied in every contract under the law of the State of Georgia, which laws govern the SFA by agreement of the parties.

60.    By failing to notify Bitmain of this emergency and by actively concealing it, Black Art also has engaged in fraudulent conduct as to a material issue upon which Bitmain rightly relied to its detriment.

12

61.    Bitmain has suffered both immediate and consequential damages as a result of Black Art's acts.

**C.    Black Art's Failure to Maintain Stable and Sufficient Power.**

62.    Since January 15, 2025, Black Art has failed to maintain stable and sufficient power to the Hosted Servers—and has even cut of the power supply to the Hosted Servers.

63.    Since February 1, 2025, Black Art has stopped powering the Hosted Servers entirely.

64.    In fact, after the power-off, Black Art removed the Hosted Servers from the Facilities and moved them to the Damascus Warehouse, where they sat inoperable.

65.    Article 6.1 of the SFA provides the following in relevant part:

> [Black Art] shall provide BITMAIN with sufficient . . . power load and facilities . . . reasonably required for the normal operation of the Hosted Servers of the reasonable commercial standard, satisfying at least [certain enumerated] requirements . . . .

(*See id.* at 16, art. 6.1.)

66.    Article 6.9 of the SFA further provides the following in relevant part:

> [Black Art] shall ensure that the Online Status Ratio in each Billing Period is no less than 95% . . . .

(*See id.* at 19, art. 6.9.)

67.    By failing to maintain stable and sufficient power, Black Art breached Article 6.1 of the SFA.

68.    By failing to maintain stable and sufficient power, Black Art also breached Article 6.9 of the SFA.

69.    Bitmain has suffered both immediate and consequential damages as a result of Black Art's acts.

4923-9958-8423 v.7

**IV.    Bitmain Terminates the SFA.**

70.    In April 2025, Bitmain proactively engaged in discussions with Black Art regarding its breaches of the SFA.

71.    However, Black Art failed to remedy its continuing breaches of the SFA.

72.    Pursuant to the SFA, Black Art's failure to remedy these breaches allowed Bitmain to unilaterally terminate the SFA.

73.    Due to Black Art's continued and unremedied breaches of the Agreement, on April 28, 2025, Bitmain notified Black Art in writing that Bitmain would exercise its right to withdraw the Hosted Servers under, *inter alia*, Article 11.2(d) of the SFA, which provides:

> This Agreement may be terminated prior to the expiration of the Term . . . upon BITMAIN giving a written notice to Service Provider to terminate pursuant to Article 3.4(d)(iii), Article 6.9(c), . . . Article 9.1, Article 15.3 or other applicable articles if the situation has not been improved after negotiation between the Parties . . . .

(Ex. A, at 24, art. 11.2(d).)

74.    A true and correct copy of the written notification notifying Black Art of Bitmain's exercise of its right to withdraw the Hosted Servers (the "Withdrawal Notice") is attached hereto as **Exhibit B**.

75.    Bitmain later terminated the SFA on June 23, 2025. The notice of termination is attached hereto as **Exhibit C**.

76.    Upon termination of the SFA, Black Art was required to "provide unfettered access to BITMAIN Personnel to the Data Center Facility and any assistance required by such BITMAIN Personnel to remove the BITMAIN Property," which includes the Hosted Servers.  (Ex. A, at 24, art. 11.3(a)(iv).)

14

77.     In its April 28, 2025 Withdrawal Notice, Bitmain demanded that Black Art allow it entry into the Facilities to remove the Hosted Servers.   Black Art refused to comply with its post-termination obligations under the SFA.

78.     On April 30, 2025, Bitmain attempted to access the Damascus Warehouse to retrieve the Hosted Servers held at that location.   Black Art refused to grant Bitmain entry.

79.     On May 14, 2025, Bitmain gave Black Art notice Bitmain intended to exercise its contractual right to access and inspect the Hosted Servers, but Black Art refused.   Bitmain made additional requests for entry on May 19, 2025 and May 22, 2025.   On May 23, 2025, Black Art explicitly responded with a refusal via email and prevented Bitmain's personnel from accessing the Damascus Warehouse believed to be holding Bitmain's Hosted Servers.   However, while outside the Damascus Warehouse, Bitmain was able to determine the Hosted Serves had been removed from the premises.

80.     Black Art has refused to grant Bitmain access to the Facilities, unlawfully detaining the Hosted Servers.   Bitmain is unable to ensure the security of the Hosted Servers and cannot ascertain whether Black Art has unlawfully sold, used without authorization, or damaged the Hosted Servers.

## FIRST CAUSE OF ACTION
### Breach of Contract

81.     Bitmain realleges and incorporates by reference the allegations contained in the above paragraphs as if fully set forth herein.

82.     On or about November 30, 2023, Bitmain and Black Art entered into the SFA.

83.     The SFA is a valid and enforceable contract.

84.     Bitmain is the proper party to bring suit for breach of contract.

85.     Bitmain fully performed its obligations under the SFA.

86.    Black Art has materially breached its obligations under the SFA by, among other things:

    a.    Preventing Bitmain from removing its Hosted Servers from the Facilities as required by Article 11.3(e)(iv) of the SFA;

    b.    Failing to provide Bitmain personnel with unfettered access to the Facilities, as required by Articles 6.7 and 6.9 of the SFA; and

    c.    Failing to maintain the safety and security of the Hosted Servers as required by Articles 4.2 and 6.5 of the SFA.

87.    As a direct and proximate result of Black Art's breaches, Bitmain has suffered damages, including damages related to Black Art's interference with Bitmain's right to possess and use its property, the Hosted Servers.

88.    Bitmain is also entitled to its attorneys' fees and costs pursuant to Article 16.5 of the SFA, which provides that "[t]he breaching Party shall bear the attorney's fees and arbitration fees of the non-breaching party."

## SECOND CAUSE OF ACTION
### Replevin

89.    Bitmain realleges and incorporates by reference the allegations contained in the above paragraphs as if fully set forth herein.

90.    Bitmain is the lawful owner of the Hosted Servers, tangible property which is, upon information and belief, currently located at a location under the ownership and/or control of Black Art.

91.    Black Art has no lawful ownership interest in the Hosted Servers.

4923-9958-8423 v.7

92.     Bitmain has demanded that Black Art return the Hosted Servers or, in the alternative, allow it to enter property at which the Hosted Severs are stored to take possession of the Hosted Servers.

93.     Black Art is aware that Bitmain is the lawful possessor of the Hosted Servers but willfully and in bad faith refuses to return the Hosted Servers or allow Bitmain access to Black Art's property to take possession of the Hosted Servers.

94.     By refusing to return the Hosted Servers or allow Bitmain access to Black Art's property to take possession of the Hosted Servers, Black Art has prevented Bitmain from exercising its right of ownership over the Hosted Servers.

95.     Black Art has converted Bitmain's property, and Bitmain is entitled to a judgment requiring Black Art to immediately deliver and return the Hosted Servers unlawfully detained in Black Art's possession, and any other relief that the Court may deem just, equitable, and proper.

### THIRD CAUSE OF ACTION
#### Conversion

96.     Bitmain realleges and incorporates by reference the allegations contained in the above paragraphs as if fully set forth herein.

97.     Bitmain is the lawful owner of the Hosted Servers, tangible property which is, upon information and belief, currently located at Black Art's facility.

98.     Black Art has no lawful ownership interest in the Hosted Servers.

99.     Black Art, upon information and belief, currently controls access to the property or properties housing the Hosted Servers.

100.    Bitmain has demanded that Black Art return the Hosted Servers or, in the alternative, allow it to enter the property or properties where the Hosted Servers are currently being housed to take possession of the Hosted Servers.

4923-9958-8423 v.7

101.    Black Art is aware that Bitmain is the lawful possessor of the Hosted Servers but willfully and in bad faith refuses to return the Hosted Servers or allow Bitmain access to the property or properties where the Hosted Servers are currently being housed to take possession of the Hosted Servers.

102.    By refusing to return the Hosted Servers or allow Bitmain access to the property or properties where the Hosted Servers are currently being housed to take possession of the Hosted Servers, Black Art has prevented Bitmain from exercising its right of ownership over the Hosted Servers.

103.    Black Art has converted Bitmain's property, and Bitmain is entitled to a judgment awarding it the value of the Hosted Servers, lost profits from Bitmain's inability to put the Hosted Servers to a productive use while those Hosted Servers are unlawfully detained at property or properties where the Hosted Servers are currently being housed, and any other relief that the Court may deem just, equitable, and proper.

104.    All conditions precedent have been performed or have occurred for Bitmain to recover from Black Art for conversion.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Bitmain asks the Court to enter an order granting Bitmain the following relief:

1. Preliminary and permanent injunctive relief granting Bitmain immediate possession of the Hosted Servers; and

2. Any such other or further relief as the Court deems just and proper.

4923-9958-8423 v.7

Dated:  July 7, 2025

By:      */s/James A. Streett*
           James A. Streett (ABA# 2007092)
           Streett Law Firm, PA
           107 West Main Street
           Russellville, AR 72801
           Tel: (479) 968-2030
           Fax: (479) 968-6253
           James@streettlaw.com


           Joseph R. Falasco
           Quattlebaum, Grooms & Tull PLLC
           111 Center Street, Suite 1900
           Little Rock, AR 72201
           Tel: (501) 379-1700
           Fax: (501) 379-1701
           jfalasco@qgtlaw.com


           *Attorneys for Plaintiff*
           *Bitmain Technologies Georgia Limited*

## **VERIFICATION**

I declare under penalty of perjury under the law of the State of Arkansas that the foregoing

is true and correct to the best of my knowledge, information, and belief.

Signed on the <u>2nd</u> day of <u>July, 2025</u> in <u>Collin</u> of <u>TEXAS</u>

                                        [County]                 [State]

Jian Ren
_____
Printed Name

*Ren Jian*
_____
Signature

20

ELECTRONICALLY FILED
Pope County Circuit Court
Rachel Oertling, Circuit Clerk
2025-Jul-07  15:35:11
58CV-25-468
C05D03 : 2 Pages

**EXHIBIT A**

## IN THE CIRCUIT COURT OF POPE COUNTY, ARKANSAS

BITMAIN TECHNOLOGIES GEORGIA,                              PLAINTIFF
LIMITED, a Georgia corporation

      VS.                        NO. 58CV-25-_____

BLACK ART OPERATION, LLC f/k/a
ARCT TECHNOLOGIES LLC, a                                   DEFENDANT
Delaware limited liability company

### NOTICE OF FILING UNDER SEAL

Exhibit A to the Plaintiff's Verified Complaint is to be filed herein under seal pending

entry of an appropriate order to seal the same for which a motion has been filed this date.

By:      */s/James A. Streett*
              James A. Streett (ABA# 2007092)
              Streett Law Firm, PA
              107 West Main Street
              Russellville, AR 72801
              Tel: (479) 968-2030
              Fax: (479) 968-6253
              James@streettlaw.com

              Joseph R. Falasco
              Quattlebaum, Grooms & Tull PLLC
              111 Center Street, Suite 1900
              Little Rock, AR 72201
              Tel: (501) 379-1700
              Fax: (501) 379-1701
              jfalasco@qgtlaw.com

              *Attorneys for Plaintiff*
              *Bitmain Technologies Georgia Limited*

2

ELECTRONICALLY FILED
Pope County Circuit Court
Rachel Oertling, Circuit Clerk
2025-Jul-07  15:35:11
58CV-25-468
C05D03 : 3 Pages

**EXHIBIT B**

# BITMAIN

Maggie WU
Bitmian Technologies Georgia Limited
900 Old Roswell Lakes Parkway,
Suite 310, Roswell, GA 30076

April 28, 2025

Matthew Chen
Arct Technologies LLC
254 Chapman Rd Ste
209 Newark, Delaware 19702

**RE: Notice of Withdrawal**

Dear Matthew:

Reference is made to the Service Framework Agreement (the "Agreement") dated November 30, 2023, between Bitmain Technologies Georgia Limited ("Bitmain") and Arct Technologies LLC ("Arct"). Capitalized terms not defined herein have the same meaning as given in the Agreement.

Arct's actions constitute material breaches of the Agreements, including but not limited to the following:

1. On November 25,2024, Bitmain discovered that 22 of the totally 29 containers were heavily snowed in as a result of the blizzard of November 19, and that Arct had failed to complete snow removal operations between the six days. On November 28, 2024, Bitmain requested access to the Data Center Facility due to witnessing fire smoke, which was refused by Arct. On the following day, Bitmain found that 9 Hosted Servers have been burned. Arct not only failed to notify in a timely manner of these two emergencies, but also concealed them, preventing Bitmain from maintaining the safety of the property, in violation of the Clause 6.5 of the Agreement.

2. Since January 15, 2025, Arct has failed to maintain the stable and sufficient power to the Hosted Servers and started to cut off the power supply. By February 1, 2025, Arct stopped powering the Hosted Servers completely, which constituted a breach of the Clause 6.1 of the Agreement.

3. According to the Arkansas Act 174 of 2024, Arkansas Code Annotated § 14-1-606, all entities operating the digital asset mining business in Arkansas should apply for the permit with the Oil and Gas Commission. However, until now, Arct has not obtained this permit or provided any supporting documents about the application after Bitmain's reminder. As a result, Bitmain cannot be sufficiently confident that Arct will succeed to obtain this permit and continue the digital asset mining business in the short foreseeable future. This creates a significant risk to Bitmain's property.

Despite Bitmain's repeated attempts to proactively engage in discussions with Arct since the above-mentioned facts, the parties have failed to reach a resolution. As such, Bitmain is exercising its right to withdraw all the relevant property, including but not limited to all Hosted Servers, from the Data Center Facility. Bitmain will arrive at the Data Center Facility on **Wednesday, April 30, 2025**, to begin retrieving its property.

Bitmain reserves the right to pursue its claims against Arct in arbitration, after which Bitmain is confident that the Tribunal will award Bitmain the damages it seeks, including arbitration costs, attorneys' fees and lost profits for each day Bitmain is unable to put the Hosted Servers to a productive use due to Arct's conduct. Bitmain's rights are not limited to those discussed in this letter, and Bitmain reserves the rights it previously asserted and may assert in the future, including the right to seek damages

1

# BITMAIN

not specified in this letter.  Bitmain does not waive any right or defense it may have with respect to this dispute.


Sincerely,

Maggie WU
Legal Counsel
Bitmian Technologies Georgia Limited

ELECTRONICALLY FILED
Pope County Circuit Court
Rachel Oertling, Circuit Clerk
2025-Jul-07  15:35:11
58CV-25-468
C05D03 : 3 Pages

# EXHIBIT C



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

Matthew G. Lindenbaum
Admitted in DC, MA, MD & VT
T: 617.217.4632

One Financial Center, Suite 3500
Boston, MA 02111
T 617.217.4700  F 617.217.4710
nelsonmullins.com

June 23, 2025

Matthew Chen
Black Art Operations LLC f/k/a
Arct Technologies LLC
Attn: Sales Department
254 Chapman Road, Suite 209
Neward, DE 19702

> RE:  **Notice of Termination of the Service Framework Agreement Dated November 30, 2023, Between Bitmain Technologies Georgia Limited and Black Art Operations LLC f/k/a Arct Technologies LLC**

Dear Matthew:

Bitmain Technologies Georgia Limited ("Bitmain") terminates the Service Framework Agreement ("SFA") dated November 30, 2023, between Bitmain and Black Art Operational LLC f/k/a Arct Technologies LLC ("Black Art") and the Supplemental Agreement dated October 14, 2024 between Bitmain and Black Art (collectively, the "SFA"). All capitalized terms not defined herein have the meaning ascribed to them in the SFA.

The SFA requires Black Art to provide sufficient Hosting Capacity to operate Bitmain's Hosted Servers at Black Art's Magnolia, Arkansas, Russellville, Arkansas, and Underwood, North Dakota data centers. Instead of complying with this obligation, in January and February 2025, Black Art off-racked Bitmain's Hosted Servers and transported them to a separate warehouse without Bitmain's consent. Black Art's conduct constitutes a material breach and repudiation of the SFA, entitling Bitmain to terminate the contract. Moreover, because none of the Hosted Servers have been Online since at least February 1, 2025, Black Art has not maintained an adequate Online Status Ratio for more than three months, entitling Bitmain to terminate the SFA under Article 11.2(d).

Bitmain hereby demands that Black Art comply with its obligations upon termination, which include but are not limited to the following.

1. Immediately provide Bitmain unfettered access to any location where the Hosted Servers are held and any assistance required by Bitmain's Personnel to remove all Bitmain Property, including the Hosted Servers;

June 23, 2025
Page 2

2. Return Bitmain's Deposit, less any undisputed Hosting Fees;

3. Pay Bitmain an amount equivalent to the Monthly Theoretical Hosting Fee due to Bitmain's termination of the SFA pursuant to Article 6.9(c); and

4. Comply with all other post-termination obligations as provided for in the SFA.

Bitmain's termination rights are not limited to those discussed in this letter, and Bitmain reserves the rights it previously asserted and may assert in the future. Bitmain does not waive any right or defense it may have with respect to this dispute.

Please confirm by **Thursday, June 26, 2025, Arkansas time,** that Black Art will allow Bitmain to retrieve its Hosted Servers from Black Art's facilities or wherever the servers are held. If you do not, Bitmain will be forced to take legal action to protect its rights.

Regards,

Matthew G. Lindenbaum