ELECTRONICALLY FILED
Pope County Circuit Court
Rachel Oertling, Circuit Clerk
2025-Jul-07  16:09:36
58CV-25-468
C05D03 : 14 Pages

## IN THE CIRCUIT COURT OF POPE COUNTY, ARKANSAS

BITMAIN TECHNOLOGIES GEORGIA,                           PLAINTIFF
LIMITED, a Georgia corporation

     VS.                          NO. 58CV-25-468

BLACK ART OPERATION, LLC f/k/a
ARCT TECHNOLOGIES LLC, a                                DEFENDANT
Delaware limited liability company

---

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION

---

Pursuant to Rule 65 of the Arkansas Rules of Civil Procedure, Bitmain Technologies Georgia Limited ("Bitmain" or "Plaintiff") respectfully submits this memorandum in support of its Motion for Temporary Restraining Order and Injunction ("Motion"), requesting that this Court issue an order temporarily and immediately restraining Black Art Operation, LLC f/k/a Arct Technologies LLC ("Black Art" or "Defendant") from selling, transferring, or otherwise disposing of certain unique and highly-valuable computer devices (specifically, Bitmain's 14,000 bitcoin mining servers) and enjoining Black Art to deliver and return said devices to Plaintiff (or another person identified by Plaintiff) permanently.

### <u>INTRODUCTION</u>

"The right of property is before and higher than any constitutional sanction." Ark. Const. Art. 2, § 22.  Bitmain seeks immediate intervention to protect its property rights to unique Bitcoin

4902-8992-3143 v.7

mining servers worth nearly $15 million (the "Hosted Severs") from Black Art. Following a pattern of unauthorized relocations of this property, Black Art now has removed this property to an unknown location and may sell, transfer, or otherwise dispose of the property if this Court does not issue an injunction requiring Black Art to return the property to Bitmain. Moreover, Black Art's interference with Bitmain's property rights has prevented Bitmain from fulfilling its contractual obligations to a third party, risking irreparable damage to Bitmain's goodwill with this counterparty—and its reputation in the Bitcoin mining industry as a whole.

On November 30, 2023, Bitmain and Black Art entered into the Service Framework Agreement (the "SFA"). (*See* **Motion Ex. A**.) Under the terms of the SFA, Black Art would provide three data centers (one in Magnolia, Arkansas, the second in Dover, Arkansas, and the third in Underwood, North Dakota) (the "Facilities") and would provide electric power and internet access sufficient to allow Bitmain to use the Hosted Servers to mine Bitcoin. Bitmain would pay Black Art a hosting fee for these services, and Bitmain was entitled to receive all mined Bitcoin.

Black Art consistently failed to meet its obligations under the SFA. Black Art failed to provide stable electric power that the Hosted Servers required to effectively function, and this failure impacted Bitmain's ability to profit from the Hosted Servers and triggered provisions in the SFA allowing Bitmain to terminate the SFA. Black Art failed to keep Bitmain's Hosted Servers safe from extreme weather and fire, and this failure permanently damaged Bitmain's highly valuable property. Black Art fraudulently hid its conduct from Bitmain, which Bitmain relied upon to its detriment. As a result, Bitmain terminated the SFA on June 23, 2025—entitling Bitmain to remove its Hosted Servers from the Facilities.

However, Black Art has refused to allow Bitmain to remove this property from the Facilities—and now has taken the property to an unknown location. Black Art has refused to cooperate with Bitmain despite Bitmain's plain entitlement to recover the Hosted Servers under the SFA. By this motion, Bitmain seeks to prevent Defendant from selling, transferring, or otherwise disposing of the Hosted Servers and to return the Hosted Servers to Plaintiff. In the *status quo*, Bitmain has the right to possess the Hosted Servers. Black Art has already moved the Hosted Servers without Bitmain's permission to an undisclosed location. The Court should prevent Black Art from further disturbing the *status quo* and should require Black Art to cease interfering with Bitmain's right to possession of this property.

## FACTUAL BACKGROUND

Black Art refuses to return approximately $15 million worth of Bitmain's unique property which Black Art does not own and which Black Art has no right to control. On November 30, 2023, Bitmain engaged Black Art to operate a data center hosting 14,000 of Bitmain bitcoin mining servers, specialized electronic devices used to generate revenue for Bitmain by validating bitcoin transactions. Bitmain relied on Black Art to provide a facility suitable to house the Hosted Servers, which require constant access to electrical power and the internet to operate. Bitmain expected to receive the rewards from any bitcoin that the Hosted Servers successfully mined, and in return, Bitmain paid Black Art a hosting fee.

Bitmain operated the Hosted Servers at three Facilities: one located at 2198 Columbia Road 12, Magnolia, Arkansas 71753, the second located at 6568 Morgan Road, Dover, Arkansas 72837, and the third located at 2801 1st St. SW, Underwood, North Dakota 58576. The Hosted Servers were operated until February 2025, when Black Art abruptly moved the Hosted Servers to an unsecured warehouse in Damascus, Arkansas, breaching Black Art's obligations under the SFA and converting Bitmain's property.

3

Black Art has shown itself to be incapable of complying with its obligations under the SFA or safeguarding the Hosted Servers. On November 19, 2024, a blizzard caused extreme weather conditions for the area in which the Facilities lie. On November 25, 2025, Bitmain discovered that 22 of the 29 total containers within which Bitmain's Hosted Servers are stored were buried under heavy snow as a result of the blizzard but that Black Art had failed to remove the snow covering those containers for at least six days. Black Art's failure to adequately care for Bitmain's technically complex and highly sensitive Hosted Servers risked significant damage thereto. Black Art not only failed to notify Bitmain of this emergency, but actively concealed it and the risks posed by it, preventing Bitmain from maintaining the safety of the Hosted Servers in violation of Article 6.5 of the SFA. (*See* Ex. A, at 18, art. 6.5 ("[Black Art] shall take standard industry practices and all necessary measures . . . to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents such as damage, loss or fire outbreak, etc. or any faults such as dust ingress, water ingress or snow ingress, etc.").)

On or around November 28, 2024, Bitmain personnel witnessed fire and smoke emanating from one Facility. In response, Bitmain requested access to the Facility to ensure that Bitmain's property was secure and undamaged. Black Art refused Bitmain's initial request for access to check on the property. Then, on the following day, Bitmain learned that nine Hosted Servers had been burned. Black Art not only failed to notify Bitmain of this emergency, but actively concealed it and the risks posed by it, preventing Bitmain from maintaining the safety of the Hosted Servers in violation of Article 6.5 of the SFA. (*See id.* ("[Black Art] shall take standard industry practices and all necessary measures . . . to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents such as damage, loss or fire outbreak, etc. or any faults such as dust ingress, water ingress or snow ingress, etc.").

Since January 15, 2025, Black Art has failed to maintain stable and sufficient power to the Hosted Servers—and has even cut of the power supply to the Hosted Servers. Since February 1, 2025, Black Art has stopped powering the Hosted Servers entirely. This misconduct violates Article 6.1 of the SFA. (*See id.* at 16, art. 6.1 ("[Black Art] shall provide BITMAIN with sufficient . . . power load and facilities . . . reasonably required for the normal operation of the Hosted Servers of the reasonable commercial standard, satisfying at least [certain enumerated] requirements . . . .").)

Due to Black Art's continued and unremedied breaches of the SFA, Bitmain demanded that Black Art allow Bitmain to enter the Facilities to retrieve the Hosted Servers, as is Bitmain's right under the SFA. Black Art refused and unlawfully detained Bitmain's property worth approximately $15 million. In fact, Black Art initially removed the property from the Facilities to a warehouse controlled by Black Art in Damascus, Arkansas and subsequently removed the Hosted Servers from the Damascus warehouse and is holding the servers in a location undisclosed and entirely unknown to Bitmain. Bitmain exercised its termination rights by letter from Bitmain counsel on June 23, 2025, including another demand for retrieval of the machines. (*See* **Motion Ex. B**, June 23, 2025 Letter from Matthew Lindenbaum to Matthew Chen). Counsel for Black Art responded to this letter with a refusal of this request that demanded payment of allegedly late invoices, which is a separate issue from ownership of the Hosted Servers. (*See* **Motion Ex. C**, July 2, 2025 Letter from Bruce Gorman to Matthew Lindenbaum). Counsel for Bitmain followed up with an email on July 3, 2025, again noting that any disagreements over invoices does not entitle Black Art to hold hostage the Hosted Servers as a "remedy." (*See* **Motion Ex. D**, July 3, 2025 Email from Matthew Lindenbaum to Bruce Gorman). Bitmain has received no response to the July 3 email.

Critically, Black Art's refusal to allow Bitmain to access its property has interfered with Bitmain's ability to fulfill its obligations under its contracts with GreenVolt Innovations LLC. Bitmain has a contractual obligation to deliver 4,794 of the Hosted Servers to GreenVolt, which it cannot perform due to Black Art's conduct. Because the Hosted Servers are no longer in production, Bitmain cannot simply replace the servers it is required to deliver to GreenVolt. Black Art's interference with this contract risks damaging Bitmain's relationship with GreenVolt. Moreover, because Bitmain's primary income stream comes from manufacturing and selling Bitcoin mining servers, by interfering with Bitmain's contract with GreenVolt, Black Art has impaired Bitmain's goodwill in the greater Bitcoin mining community, irreparably damaging Bitmain's ability to enter into future contracts for the sale of Bitcoin mining servers.

Due to Black Art's refusal to allow Bitmain to retrieve this property, Bitmain seeks an order preventing Black Art from selling, transferring, or otherwise disposing of the Hosted Servers and requiring Black Art to return the Hosted Servers to Bitmain.

## LEGAL STANDARD

"In determining whether to issue a preliminary injunction or temporary restraining order pursuant to Rule 65, the trial court must consider two things: (1) whether irreparable harm will result in the absence of an injunction or restraining order, and (2) whether the moving party has demonstrated a likelihood of success on the merits." *Baptist Health v. Murphy*, 362 Ark. 506, 509, 209 S.W.3d 360, 362 (2005).

## ARGUMENT

A temporary restraining order is necessary to preserve the *status quo* pending the final resolution of this case on the merits. Article 13.1 of the SFA specifically notes that Black Art acknowledged that a "breach…of [the SFA] shall cause serious and irreparable harm to [Bitmain]" and that Bitmain "shall be entitled to injunctive relief…without the necessity of obtaining any form

6

or bond or undertaking whatsoever, and [Black Art]…waives any claim or defense that…otherwise preclude injunctive relief." *See* Ex. A, at 26, art. 13.1. As such, Bitmain is entitled to a temporary restraining order and injunction from this court without the need for bond or undertaking, per the explicit agreement and consent of the parties.

Despite the contractual requirement to return the Hosted Servers after termination of the Parties' agreement, Black Art not only refuses to return 14,000 bitcoin mining servers worth more than $15 million in total, but also has taken them to an unknown location. Because Bitmain satisfies each element required for a temporary restraining order, as addressed below, this Court should enter the requested order to maintain the *status quo* and prevent irreparable harm to Bitmain.

**I.    Bitmain will suffer immediate and irreparable loss or damage without emergency relief.**

Bitmain is at risk of suffering immediate and irreparable harm if the Court does not issue emergency relief preserving the *status quo* during the pendency of this action. In addition, and as a preliminary matter, Black Art contractually conceded that monetary damages would be inadequate, and they expressly waived any defense that monetary damages would be sufficient.

**A.    Black Art has absconded with Bitmain's property, causing irreparable harm.**

Absent action from the Court, Black Art may take, destroy, or sell Bitmain's property. By February 2025, Black Art had ceased operating Bitmain's Hosted Servers and had transported the Hosted Servers from all three Facilities to a warehouse in Damascus, Arkansas. Bitmain has recently discovered that Black Art has removed the Hosted Servers from the warehouse. Black Art has not disclosed the current location of the Hosted Servers to Bitmain. Bitmain asked for the servers back from Bitmain in February 2025 and Black Art refused. Without action from the Court, Black Art may sell the Hosted Servers, convert them to its own use, or otherwise remove the

7

servers from the State of Arkansas. Such interference with property rights constitutes irreparable

injury supporting a temporary restraining order. *See Rutherford v. Casey*, 190 Ark. 79, 77 S.W.2d

58, 59–60 (1934) (affirming plaintiff's demonstration of irreparable harm where defendant took

plaintiff's property and had threatened to dispose of it).

Moreover, Black Art's wrongful theft of the Hosted Servers has caused and continues to

cause recurring damages to Bitmain. *See Meriwether Sand & Gravel Co. v. State*, 181 Ark. 216,

26 S.W.2d 57, 62 (1930) ("Where the injury is a recurring one and the damages sustained are of a

substantial nature, equity will restrain its continuance by injunction."). For each day that Black

Art wrongfully possesses the Hosted Servers, Bitmain loses 1 bitcoin in mining rewards, which,

at the current value of Bitcoin, amounts to over $3 million in lost revenue per month. This

recurrent injury to Bitmain demands injunctive relief.

**B.      Furthermore, immediate injunctive relief is necessary to prevent Black Art's continued violation of Bitmain's constitutional property rights.**

The Arkansas Constitution recognizes the fundamental significance of property rights:

"The right of property is before and higher than any constitutional sanction . . . ." Ark. Const. art.

2, § 22. The deprivation of such a constitutional right can constitute irreparable injury. *Elrod v.

Burns*, 427 U.S. 347, 373 (1976). For each day that Black Art wrongfully possesses the Hosted

Servers, Black Art strips Bitmain of rights recognized and guaranteed by the Arkansas

Constitution. A temporary restraining order is necessary to prevent this irreparable harm to

Bitmain. Bitmain will suffer irreparable harm from loss of its goodwill and impairment of business

relationships with third-party purchasers of the Hosted Servers.

By preventing Bitmain from fulfilling its obligations to GreenVolt, Black Art risks

damaging Bitmain's goodwill with this customer and its reputation in the Bitcoin mining

community. GreenVolt is one of Bitmain's most important clients, and the two companies have

8

always maintained a strong cooperative relationship. Bitmain has earned GreenVolt's satisfaction through its integrity and high-quality service. However, due to Black Art's actions, Bitmain has been forced to delay the performance of the sales and purchase agreement, which has caused GreenVolt to question Bitmain's commitment to the cooperation and has seriously damaged the partnership between the two parties. Black Art's continued interference with Bitmain's ability to comply with its obligations to GreenVolt creates a significant risk that Bitmain may lose GreenVolt as a client and suffer reputational harm within the Bitcoin mining industry, leading to irreparable loss of goodwill. "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002); *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("[T]he loss of customers and goodwill is an irreparable injury." (quoting *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). Courts therefore conclude that injunctive relief is appropriate to prevent damage to goodwill and business reputation. *E.g.*, *Trinity Behav. Health Care Sys., Inc. v. Arkansas Dep't of Hum. Servs.*, 2014 WL 5817095, at *2–3 (E.D. Ark. Nov. 7, 2014).

As detailed above, Bitmain needs the Hosted Servers to fulfill its obligations to GreenVolt. Without emergency relief enabling Bitmain to do so, the Court will later need to engage in the inherently speculative endeavor of determining the impact of Black Art's misconduct to Bitmain's business operations as a result of Bitmain's failure to deliver the Hosted Servers to GreenVolt: Unless avoided, this process will require the Court to resolve whether GreenVolt is forced to a different supplier to purchase their next batch of Bitcoin mining servers as a result of Black Art's misconduct; and whether GreenVolt tells other server operators that Bitmain was unable to deliver these servers and, if so, the impact thereof on Bitmain's sales to those other operators. It is

9

precisely to shut down this sort of speculative lost profits analysis that courts consider potential

harm to goodwill and business relations "an appropriate basis for injunctive relief." *E.g.*, *Variable*

*Annuity Life Ins. Co. v. Joiner*, 454 F. Supp. 2d 1297, 1304 (S.D. Ga. 2006) ("[H]arm from lost

accounts and lost customer goodwill and business is irreparable because it is neither easily

calculable, nor easily compensable").

> ### C.    Black Art's contractual concession and waiver of defenses regarding emergency relief.

In executing the SFA, Black Art conceded in Article 13.1 that "a breach or threatened

breach of this Agreement shall cause serious irreparable harm to BITMAIN for which monetary

damages alone would not be a sufficient remedy." (Ex. A, at 26, art. 13.1.) Black Art expressly

agreed that, in the event that it breached or threatened to breach the SFA, then "BITMAIN shall

be entitled to injunctive relief and specific performance." (*Id.*) Black Art further "waive[d] any

claim or defense that damages may be adequate or ascertainable or otherwise preclude injunctive

relief." (*Id.*) This concession and waiver ends the discussion—Black Art simply cannot dispute

that Bitmain is entitled to injunctive relief.

Interpreting similar agreements, courts have historically given effect to provisions that

allow for injunctive relief where the parties contractually agree that a breach of the contract would

constitute irreparable harm.[1] *See U.S. Sec. Assocs., Inc. v. Schwartz*, No., 2019 WL 10303652, at

*6 (N.D. Ga. Feb. 15, 2019) (finding irreparable harm where the defendant "agreed that a remedy

for damages would be inadequate, and consented to an injunction prohibiting any conduct violating

---

[1] Though Arkansas law governs procedural issues in this case, pursuant to the Parties' SFA, Georgia law governs the parties' contract, Bitmain's contract claims, and any relief arising therefrom. The SFA provides that the "Agreement shall be solely governed by and construed in accordance with the laws of the Relevant Jurisdiction, without regard to principles of conflict of laws." (Ex. A, at 28, art. 16.4.) The SFA defines the "Relevant Jurisdiction" as "the State of Georgia of the United States of America." (*Id.* at 6, art. 1.1, *s.v.* "Relevant Jurisdiction.")

the post-termination obligations"). Bitmain demonstrates below why it is entitled to injunctive relief. Furthermore, because Black Art expressly agreed to injunctive relief as a remedy and waived any right to oppose or defend against injunctive relief based on any argument that monetary damages are sufficient, the Court should enter the requested temporary restraining order.

### D. Monetary damages that Black Art cannot pay are not an adequate remedy.

Emergency relief would prevent further damage to Bitmain, which Black Art likely cannot pay,. *See United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1359 (11th Cir. 2019) (injunction appropriate to "staunch the flow of ongoing future losses as the [defendants] continue to accumulate . . . liabilities"). The Hosted Servers are capable of generating approximately 1 bitcoin in mining rewards per day. At the current value of Bitcoin, Bitmain's lost revenue totals more than $3 million per month. The Hosted Servers also continue to depreciate, causing Black Art's liability to increase each day it unlawfully detains the servers. In addition, the Hosted Servers, sophisticated electronics, are susceptible to damage if not properly maintained. It is highly unlikely that Black Art is adequately maintaining the Hosted Servers at its warehouse, which is not provisioned as a data center, thus increasing the risk of damage to the Hosted Servers.

Moreover, as detailed above, damage to Bitmain's reputation in the industry and with its hard-earned clients cannot be improved retroactively through monetary damages. Bitmain has cultivated goodwill which Black Art's actions will destroy or damage—and Black Art cannot repay Bitmain in lost goodwill.

### II. Bitmain is likely to succeed on the merits of its claims.

Bitmain asserts causes of action against Black Art for conversion, replevin, and breach of contract. Bitmain is likely to succeed on the merits of these causes of action as outlined below.

**A.    Bitmain is likely to succeed on its conversion and replevin claims.**

Bitmain is likely to succeed on its conversion and replevin claims, as all of those claims are based on Black Art's refusal to return property which it has no right to keep.  Conversion requires Bitmain to show that Black Art "wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is inconsistent with the owners' rights." *McQuillan v. Mercedes-Benz Credit Corp.*, 331 Ark. 242, 247, 961 S.W.2d 729, 732 (1998); *Com. Fitness Concepts, L.L.C. v. WGL, LLC*, 2017 Ark. App. 148, 7, 516 S.W.3d 764, 769 (2017) ("To establish liability for the tort of conversion, a plaintiff must prove the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is inconsistent with the owner's rights.").  Replevin requires a substantively identical showing. *See Akins v. Pierce*, 263 Ark. 15, 17, 563 S.W.2d 406, 407 (1978) ("Replevin is a possessory action, it being incumbent on the plaintiff to show that he is entitled to immediate possession of the chattel in question."); *France v. Nelson*, 292 Ark. 219, 221, 729 S.W.2d 161, 163 (1987) ("A replevin action is to recover property.  Conversion is a common law tort action for the wrongful possession or disposition of another's property. . . . They are separate causes of action.  The measure of damages in a conversion action is different from that in a replevin suit.").  The same facts show that Bitmain is likely to succeed on its claims for breach of contract, conversion,, and replevin.

Instead of returning Bitmain's Hosted Servers after Bitmain's termination of the SFA, as required by the contract, Black Art has retained Bitmain's Hosted Servers for Black Art's own benefit—devices capable of generating approximately 1 BTC in revenue every day.  Black Art held the Hosted Servers at the beginning of this action and has refused Bitmain's lawful demand to return the property.  As discussed above, Black Art has no right to possession or use of the Hosted Servers, so Black Art is profiting to the detriment of Bitmain.  Bitmain is therefore likely to succeed in proving that Black Art has unlawfully denied Bitmain possession of its property,

12

breaching it contract with Bitmain, committing the tort of conversion, and being unjustly enriched by its wrongful conduct.

**B.    Bitmain is likely to succeed on its breach of contract claims.**

Bitmain is likely to succeed on its breach of contract claims because Black Art plainly failed to comply with the terms of the SFA to the detriment of Bitmain.  The SFA is a valid and enforceable contract between Bitmain and Black Art.  Bitmain has fully performed its obligations under the SFA, whereas Black Art has materially breached numerous provisions of the SFA.  First, Article 6.5 of the SFA requires Black Art to ensure safety and security of the Facilities and the Hosted Servers—including against "fire outbreak" and "snow ingress"—yet Black Art failed to protect the Hosted Servers during a fire and following a blizzard.  Second, Article 6.7 of the SFA requires Black Art to provide all necessary support and cooperation for the operation and maintenance of the Hosted Servers, yet Black Art failed to inform Bitmain of the emergencies just mentioned and attempted to actively conceal them.  Third, Article 6.9 of the SFA requires Black Art to maintain the Online Status Ratio no less than 95%, yet Black Art maintained the Online Ratio Status below 95% during the months of May 2024, June 2024, September 2024, November 2024, December 2024, and January 2025.  Fourth, Article 6.7 of the SFA requires Black Art to provide Bitmain unfettered access to the Facilities due to the breaches just detailed, yet Black Art has refused to provide Bitmain such access.  Accordingly, Bitmain has shown a likelihood on the success of the merits for its breach of contract claim.

## CONCLUSION

Bitmain is entitled to possession of the Hosted Servers.  A temporary restraining order is necessary so that Bitmain may avoid irreparable damage to its contractual relations with third parties and to prevent Black Art from further absconding with or damaging the Hosted Servers.

13

Wherefore, Bitmain prays for a temporary restraining order providing that Black Art is enjoined and prohibited from selling, transferring, or otherwise disposing of the Hosted Servers and providing that Black Art must return the Hosted Servers to Bitmain permanently.

Dated: July 7, 2025

By:    _/s/James A. Streett_____
James A. Streett (ABA# 2007092)
Streett Law Firm, PA
107 West Main Street
Russellville, AR 72801
Tel: (479) 968-2030
Fax: (479) 968-6253
James@streettlaw.com

Joseph R. Falasco
Quattlebaum, Grooms & Tull PLLC
111 Center Street, Suite 1900
Little Rock, AR 72201
Tel: (501) 379-1700
Fax: (501) 379-1701
jfalasco@qgtlaw.com

*Attorneys for Plaintiff*
*Bitmain Technologies Georgia Limited*

4902-8992-3143 v.7